UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| ISMAEL MARTINEZ, | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | Civil Action No.: 1:23-cv-00024-C |
| | § | |
| HONEYWELL INTERNATIONAL, INC.; | § | |
| HONEYWELL SAFETY PRODUCTS | § | |
| USA, INC.; HONEYWELL BUILDING | § | |
| SOLUTIONS SES CORP.; WANZEK | § | |
| CONSTRUCTION, INC.; ENEL NORTH | § | |
| AMERICA, INC.; AND ENEL X NORTH | § | |
| AMERICA, INC., | § | |
| *Defendants*. | § | |

---

**PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE TO DEFENDANT WANZEK CONSTRUCTION, INC.'S MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.      Introduction ......................................................................................................... 7

II.     Factual Background ............................................................................................ 8

   A.   Plaintiff was injured at Enel's Azure Sky Windfarm. ........................................ 8

   B.   Investigations revealed an improperly secured lifeline cable. ......................... 10

   C.   Wanzek was responsible for improperly installing the fall arrest equipment. ................ 12

   D.   Wanzek was aware other contractors like Plaintiff were usings its defective lifeline. ..... 13

   E.   Wanzek was aware of the frequent utilization of its improperly installed equipment. ...... 15

   F.   Plaintiff relied on Wanzek for proper installation. ........................................... 16

   G.   Wanzek contractual obligations included provisions to keep Plaintiff safe. .................. 16

   H.   Wanzek admits its error—and everyone else agrees. ........................................ 17

III.    Legal Standard ................................................................................................. 19

IV.     Argument ......................................................................................................... 20

   A.   Plaintiff's claims are not limited to premises liability. ..................................... 20

     1.   Wanzek owed a duty in ordinary negligence. ............................................. 21

    2.    Wanzek owed a duty under negligent undertaking principles. ...................................... 23

    3.    Wanzek owed a duty under a Redinger control. .......................................................... 25

B.   In addition, Wanzek owed a duty in premises liability and Enel's breach proximately caused Plaintiff's injuries ................................................................................................ 27

    1.    Wanzek owed Plaintiff a duty of care as an invitee. .................................................... 27

    2.    Factual disputes preclude summary judgment on each element of Plaintiff's premises liability claim. ............................................................................................................... 28

    3.    The defect was not obvious .......................................................................................... 30

    4.    Even if Plaintiff were a trespasser (he wasn't) factual disputes preclude summary judgment disposition. ................................................................................................... 32

V.      Rule 56(F) Motion to Continue .......................................................................................... 36

VI.    Conclusion ........................................................................................................................... 37

# TABLE OF AUTHORITIES

Page(s)

Cases

*AEP Tex. Cent. Co. v. Arredondo*,
    612 S.W.3d 289 (Tex. 2020) ................................................................................. 26

*Am. Industries Life Ins. Co. v. Ruvalcaba*,
    64 S.W.3d 126 (Tex. App.--Hous. [14th Dist.] 2001) ........................................ 27, 29

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................... 19

*Arambula v. J. M. Dellinger, Inc.*,
    415 S.W.2d 456 (Tex. Civ. App.--San Antonio 1967) ........................................ 28

*Armendariz v. Wal-Mart Stores, Inc.*,
    721 Fed. Appx. 368 (5th Cir. 2018) .................................................................... 29

*Buchanan v. Rose*,
    159 S.W.2d 109 (Tex. 1942) ............................................................................... 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................... 19, 20

*City of Denton v. Page*,
    701 S.W.2d 831 (Tex. 1986) ............................................................................... 24

*CMH Homes, Inc. v. Daenen*,
    15 S.W.3d 97 (Tex.2000) .................................................................................... 29

*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*,
    271 S.W.3d 238 (Tex. 2008) ............................................................................... 33

*Cruz v. Centene Corp.*
    2:15-CV-380, 2016 WL 3906293 (S.D. Tex. July 19, 2016) .............................. 20

*Dow Chem. Co. v. Bright*,
    89 S.W.3d 602 (Tex. 2002) ............................................................................. 25, 26

*El Chico Corp. v. Poole*,
    732 S.W.2d 306 (Tex. 1987) ............................................................................... 22

*Elmgren v. Ineos USA, LLC*,
    431 S.W.3d 657 (Tex. App.—Houston [14th Dist.] 2014) .................................. 20

3

*Energen Res. Corp. v. Wallace*,
   642 S.W.3d 502 (Tex. 2022) .................................................................... 26

*F.F.P. Operating Partners, L.P. v. Duenez*,
   237 S.W.3d 680 (Tex. 2007) .................................................................... 22

*Farrar v. Sabine Mgt. Corp.*,
   362 S.W.3d 694 (Tex. App.—Hous. [1st Dist.] 2011) ............................... 29

*Frias v. Atlantic Ritchfield Co.*,
   999 S.W.2d 97 (Tex. App.—Houston [14th Dist.] 1999, pet. denied ........ 29

*Fruge v. Ulterra Drilling Techs., L.P.*,
   883 F. Supp. 2d 692 (W.D. La. 2012) ...................................................... 37

*Guereque v. Thompson*,
   953 S.W.2d 458 (Tex. App.—El Paso 1997, pet. denied) .......................... 24

*Harris Cty. v. Eaton*,
   561 S.W.2d 245 (Tex.Civ.App.—Houston [14th Dist.] 1978) .................... 31

*Helbing v. Hunt*,
   402 S.W.3d 699 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ........ 20

*Int'l Shortstop, Inc. v. Rally's Inc.*,
   939 F.2d 1257 (5th Cir.1991) .................................................................. 37

*JLB Builders, L.L.C. v. Hernandez*,
   622 S.W.3d 860 (Tex. 2021) .................................................................... 26

*Keetch v. Kroger Co.*,
   845 S.W.2d 262 (Tex. 1992) .................................................................... 29

*Kielwein v. Gulf Nuclear, Inc.*,
   783 S.W.2d 746 (Tex. App.—Houston [14th Dist.] 1990, no pet. ........ 29, 35

*Lawrence v. TD Indus.*,
   730 S.W.2d 843 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ...................... 35

*Lee Lewis Const., Inc. v. Harrison*,
   70 S.W.3d 778 (Tex. 2001) ......................................................... 26, 32, 33

*Lefmark Mgmt. Co. v. Old*,
   946 S.W.2d 52 (Tex. 1997) ...................................................................... 24

4

*Los Compadres Pescadores, L.L.C. v. Valdez*,
    622 S.W.3d 771 (Tex. 2021) ................................................................... 31

*Mayer v. Willowbrook Plaza Ltd.*,
    278 S.W.3d 901 (Tex. App.--Hous. [14th Dist.] 2009) ............................ 27

*Mobil Oil Corp. v. Ellender*,
    968 S.W.2d 917 (Tex. 1998) ............................................................ 33, 34

*Nabors Drilling, U.S.A., Inc. v. Escoto*,
    288 S.W.3d 401 (Tex. 2009) ................................................................... 21

*New Hampshire Ins. Co. v. Rodriguez*,
    569 S.W.3d 275 (Tex. App.—El Paso 2019, pet. denied) ....................... 24

*Nguyen v. Sephora USA*,
    2014 WL 4202538 (Tex. App.—Houston [14th Dist.] Aug. 26, 2014, no pet. ......................... 21

*Oncor Elec. Delivery Co., LLC v. Murillo*,
    449 S.W.3d 583 (Tex. App.--Hous. [1st Dist.] 2014) ............................. 28

*Prado v. Lonestar Res., Inc.*,
    647 S.W.3d 731 (Tex. App.—San Antonio 2021, pet. filed) .................... 31

*Rodriguez v. Cemex, Inc.*,
    579 S.W.3d 152 (Tex. App.—El Paso 2019, no pet.) ............................... 31

*Sports Ass'n v. Russell*,
    450 S.W.2d 741 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e. ......................... 31

*Texas Utilities Elec. Co. v. Timmons*,
    947 S.W.2d 191 (Tex.1997) ................................................................... 32

*Thapar v. Zezulka*,
    994 S.W.2d 635 (Tex.1999) ................................................................... 27

*THI of Texas at Lubbock I, LLC v. Perea*,
    329 S.W.3d 548 (Tex. App.—Amarillo 2010, pet. denied) ...................... 35

*Turner v. Franklin*,
    325 S.W.3d 771 (Tex. App.—Dallas 2010, pet. denied) ..................... 34, 35

*U-Haul Int'l, Inc. v. Waldrip*,
    380 S.W.3d 118 (Tex. 2012) ................................................................... 32

*United Rentals N. Am., Inc. v. Evans*,
    668 S.W.3d 627 (Tex. 2023) ........................................................................ 22, 23

*W. Invs., Inc. v. Urena*,
    162 S.W.3d 547 (Tex.2005) ................................................................................ 27

*Wohlstein v. Aliezer*,
    321 S.W.3d 765 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ......................... 29

Rules

Fed. R. Civ. P. 56(c) ................................................................................................ 19
Fed. R. Civ. P. 56(d) ........................................................................................... 37, 38

Other Authorities

Restatement (Second) of Torts § 302 ......................................................................... 21
Restatement (Second) of Torts § 324A (1965) ............................................................. 24

## I.      INTRODUCTION

On November 16, 2021, Plaintiff Ismael Martinez suffered catastrophic injuries while working for Nordex USA, Inc. ("Nordex") inside a wind turbine under construction at Enel North America, Inc.'s ("Enel") Azure Sky Wind Project. His fall arrest system, called "Vi-Go," failed to stop his fall. Turns out, the fall arrest system failed because Defendant Wanzek Construction, Inc. ("Wanzek") zip-tied the lifeline cable he relied to the base rather than properly tensioning and securing it according to the manufacturer's instructions.

Wanzek now moves for summary judgment contending Plaintiff was somehow a trespasser who was unauthorized to be on site. But the only evidence is that Plaintiff was performing his job responsibilities as Nordex's employee by responding to a request from Wanzek to inspect broken guide pins on the 5th floor of Tower A-01 that were preventing the engine from being properly installed. And Wanzek ignores a mountain of other inconvenient facts, for instance: (i) Wanzek had contractually agreed to provide the fall arrest equipment for the project and to do so safely; (ii) this was not the first tower constructed and Wanzek's crew regularly dropped the lifeline cable and haphazardly fastened it with a zip tie as a temporary measure—considering the cable *ready for use*; (iii) Wanzek understood Plaintiff and other contractors were frequently utilizing the lifelines it had installed in this improper manner; and (iv) despite having actual knowledge of the dangers posed by the untensioned cable, Wanzek took *zero* action to lock out the equipment, provide warnings, or prohibit access until the lifeline could be correctly installed. What's worse, Wanzek allowed—and indeed, directed—Plaintiff to access and use the tower and its knowingly deficient fall protection setup.

These shocking circumstances give rise to Wanzek's liability under multiple legal theories improperly brushed aside by Wanzek including ordinary negligence, negligent undertaking, and

negligent retention of control, as detailed below. And even under premises liability, *under no reading of the facts* was Plaintiff a trespasser for doing his job (though Wanzek would still be liable for gross negligence even if he were). And viewing the facts in the light most favorable to Plaintiff—as the Court must here—Plaintiff was an invitee because he was in the turbine with Wanzek's knowledge and for the mutual benefit of both. Wanzek is liable for its role in Plaintiff's injuries as a result.

For these reasons, and as detailed below, Wanzek's attempts to evade responsibility should be firmly rejected and its motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff was injured at Enel's Azure Sky Windfarm.

As part of its expansive renewable energy operations, Enel undertook the construction of a new wind farm near Throckmorton, Texas known as the "Azure Sky Wind Project." *See, E.g.,* App. 7 (Gibson Report); App. 32 (8D-Report); App. 50 (O'Brien First Dep.).



[1]

---

[1] Found at https://www.enelgreenpower.com/our-projects/operating/azure-sky-wind-storage-farm.

The project consisted of 79 wind turbines. App. 87-89 (Enel Press Release). Construction began in March 2021.[2] Nordex made and sold the wind turbine Enel used on the project. App. 40 (Gibson Report). And Enel hired Nordex as "technical advisors" to the construction project. App. 51 (O'Brien First Dep.).  Enel also retained Wanzek to "handle[ ] all the erection of the tower sections and then the electrical connection between the tower and the grid." App. 50 (O'Brien First Dep.); App. 96-97 (Strange Dep.); App. 130 (Caro Dep.); App. 7 (Gibson Report).

On November 16, 2021, Plaintiff was working for Nordex as a quality technician. App. 7 (Gibson Report). He was tasked with inspecting damaged nacelle guide pins atop Tower A-01, one of the 350-foot towers. *Id.* at 9-10 (Gibson Report).[3] To inspect the damaged guide pins, Plaintiff had to climb a ladder inside the tower up five levels. *Id.*

The ladders in the towers were equipped with horizontal lifelines and a fall protection system manufactured by Honeywell called the "Vi-Go" that was supposed to automatically stop a construction worker's fall. App. 38 (8D-Report). Workers would clip their harnesses to carriers riding along the cables as they climbed. The tower and product are shown here:



---

[2] *See* App. 94 (Press Release); *see also*   https://www.enelgreenpower.com/our-projects/operating/azure-sky-wind-storage-farm.

[3] The nacelle, or housing unit at the turbine's peak containing key mechanical equipment, was not properly attaching atop Tower A-01.

On the day of the incident, Plaintiff ascended Tower A-01's ladder to the necessary height to reach the guide pins on the fifth level. App. 9 (Gibson Report). It was the first time Plaintiff had climbed Tower A-01. App. 170 (Martinez First Dep.). The tower was unlocked. App. 442 (Second Espinoza Dep.). Plaintiff was accompanied to the tower by fellow technician Manuel Huereca. App. 183 (Martinez First Dep.). While Plaintiff climbed, Mr. Huereca remained at the base. App. 9 (Gibson Report). The two men's only means of communication was by mobile phone or text messages. App. 32 (8D-Report).

At 2:29 PM, Plaintiff texted the quality team that he was descending from the tower. *Id.* However, when the Nordex Quality Lead Rodney Herman checked in at 4:20 PM, Plaintiff had not been heard from. Unable to reach him by phone, Nordex management instructed Mr. Huereca to climb the tower and locate Plaintiff. *Id.* Mr. Huereca found Plaintiff unconscious "in very bad condition" near the fourth-floor deck platform "still connected to the lifeline next to the railing." App. 10 (Gibson Report).

After finally extracting Plaintiff at 6:40 PM, Martinez was rushed to the hospital in critical condition from his injuries, including a broken femur and traumatic brain injury. App. 230, 233 (Martinez Second Dep.); App. 33 (8D-Repot). He remained in a coma for 10 days. App. 210 (Martinez First Dep.). Plaintiff has no memory at all of the incident itself—neither ascending nor performing any work—with his first recollection being when he awoke later in the hospital. App. 207 (Martinez First Dep.).

### B.    Investigations revealed an improperly secured lifeline cable.

After the accident, Enel, Wanzek, and Nordex jointly investigated the cause of the incident. App. 34 (8D-Report). Their investigation determined that the Vi-Go system failed to properly arrest Plaintiff's fall, *i.e.*, prevent his plummet by engaging the cable grab. App. 35 (8D-Report).

The fall arrest system was not properly installed or certified for its intended use. App. 283 (Espinoza First Dep.); App. 130-131 (Caro Dep.). The cable lifeline was not secured and tensioned at the base of the tower, as required by the manufacturer. App. 34 (8D-Report); App. 66 (O'Brien First Dep.); App. 506 (Assembly Instructions).[4] Instead, the excess lifeline cable was coiled and held to the ladder with a zip tie. *Id.; see also* App. 61 (O'Brien First Dep.). These pictures demonstrate the difference between a correctly installed and tensioned lifeline, and the zip tied line on Tower A-1.



*See* App. 514 and 492 (Photos).

OSHA similarly found that Plaintiff was "exposed to fall hazards where the lower end of the carrier cable was not attached to a mounting in accordance with the instructions provided by

---

[4] The manufacturer specifies that the lifeline cables must be attached and tensioned prior to using the Vi-Go device App. 493 (Assembly Instructions); App. 34 (D-8 Report). And an independent study showed that when the lifeline has zero tension, the Vi-Go fails to arrest a fall. *Id.*

the manufacturer of the device." App. 592 (OSHA Report). The "Safety Alert" Nordex released after the accident stated that "[t]he use of any temporary or definitive lifeline is strictly prohibited if this has not been 100% installed and tensioned (for cable lifelines) as per the Nordex Instructions and verified by Nordex Quality Department." App. 516 (Safety Alert). The improper or incomplete zip tie method "can lead to serious risk of falling even when using a cable grab such as a Vi-Go." App. 516 (Safety Alert).

The incident investigation also determined that there were oversight "gaps" in ensuring the fall protection equipment was properly secured and tensioned by the construction contractor. App. 41 (8D-Report). The construction crews themselves had not been made aware by any party of the manufacturer's safety guidelines for appropriate Vi-Go system installation and tensioning. *Id.*

### C.    Wanzek was responsible for improperly installing the fall arrest equipment.

Wanzek was responsible for constructing the wind turbines, including the fall arrest equipment like the lifeline cable. App. 34 (8D-Report), App. 553, 571 (R. Jabour Dep.), App. 589 (Caro Dep.). The turbines remain in Wanzek's possession until they are turned over to the client, Enel. App. 556, 571 (R. Jabour). Wanzek builds the structure in sections, initially using temporary lifelines to ensure worker safety. App. 556, 571 (R. Jabour Dep), App. 587-588 (Carlson Dep.). After the fifth section is erected, the temporary cables are removed, and Wanzek's drops the permanent lifeline cable. App. 589 (Carlson Dep.), App. 556, 571 (R. Jabour Dep.). Wanzek secures the cable out of the way at the bottom with a zip tie. App. 589 (Carlson Dep.). Wanzek dropped the lifeline on Tower A-01 on November 13, 2021. 34 (8D Report). Wanzek was in full control of determining this order of erection:

> Q     And so, if -- so, it's just: Wanzek decides, "Hey, this is the way we're going to do things. We're going to put it in; and then, the mechanical group's going to come in at the end and install this bottom bracket"?

A  Correct, yes.

Q  And -- and that's not a specific instruction by Nordex; that's something that Wanzek decides on the order of operations on how they want to do things; fair?

A  Correct.

App. 557 (R. Jabour Dep.).[5]

According to Wanzek's quality specialist Patty Carlson, when the cable was dropped, and zip tied, Wanzek considered the lifeline "ready to be used." App. 587 (Carlson Dep.). Wanzek accordingly permitted the use of the cable lifeline in this condition until it installs the bottom bracket and tension the cable—a "last minute adjustment" end-of-construction task done just before the tower is turned over to the client. App. 571 (Jabour Dep.); *see also* App. 589, 590 (Carlson Dep.), App. 557, 566, 571 (R. Jabour Dep.), App. 589 (Carlson Dep.).

### D. Wanzek was aware other contractors like Plaintiff were usings its defective lifeline.

At the time of the incident, Plaintiff was working as a quality technician for Nordex, the seller of the towers. His job responsibilities included inspecting, performing quality control, taking measurements and pictures of problems, and writing up reports to help Wanzek, the general contractor on the project, figure out issues they were having.

Q.  Okay. You stated in the interrogatories that your job was inspection, quality control, taking measurements and pictures of the problem, and write-up reports. What was the problem you were inspecting?

A.  They were -- it was Wanzek or Enel who called us having a problem at that tower. So they call us to go help them figure out what's wrong with it, and all I was told was that they could not set a nacelle to the top of the tower, so that's what I was there to do.

---

[5] In this Response deposition quotes are cleaned up for ease of reading.

App. 108, 206 (Martinez First Dep.). Mr. Martinez has climbed other Wanzek constructed wind turbine towers as part of his job, estimating he had climbed more than 10 towers at that site before the incident. App. 178, 203-204 (Martinez First Dep.). On the day of the incident, Wanzek sent Mr. Martinez to Tower A-1 specifically to inspect and take pictures of guide pins that were preventing the nacelle from being installed onto the tower. *Id.* At 180.

> Q.    Do you know whether or not Mr. Carlson ever communicated with somebody from Enel or Wanzek that you and Mr. Fuentes were going into the tower A-1 on November 16th, 2021?
>
> A.    I believe so.
>
> Q.    Why do you say that?
>
> A.    He was on the phone yelling across the office, hey, they having a problem, we -- they need you over there.

App. 183 (Martinez First Dep.).

Again, Wanzek allows workers to use the lifeline in an unfinished condition:

> Q     Okay. So, the temporary cables will be removed, and those individuals will have to go up and down the ladder, utilizing this permanent cable that's installed at the top; fair?
>
> A     Yes.
>
> Q.    But they're utilizing that cable that's installed at the top, but it hasn't been secured at the bottom yet; fair?
>
> A     Yes.

App. 556-557, 575 (Jabbour Dep.); *see also id.* at 43 ("So, it's your understanding that the cable would be certified by somebody at Wanzek that it's proper to be used prior to the bottom-securing device being implemented onto that cable; correct? A Correct."). After the cable was dropped, it was the only lifeline on the tower:

> Q    So, there would be no other cable for anybody working in that tower to be able to utilize while climbing the ladder, other than the main cable that wouldn't be secured to the bottom; fair?
>
> A    Correct.

App. 590; *see also* 589 (Carlson Dep.).

Wanzek never tried to control access to the tower due to the lifeline—it considered the cable safe for use. App. 618-619 (Carlson Dep.). Similarly, it provided no warning signate reflecting any danger—when it considered the lifeline safe for use. App. 593 (Carlson Dep.), App. 561 (Jabour Dep.). Wanzek participates in plan of the day (POD) meetings with other contractors. App. 590-591, 596-597 (Carlson Dep.). And Wanzek knew Nordex and other contractors had access to the base of the tower. App. 618-619 (Carlson Dep.).

### E.    Wanzek was aware of the frequent utilization of its improperly installed equipment.

Over 20 towers were completed under Enel's supervision by the time of this incident. App. 130 (Caro Dep.); App. 180-181 (Strange Dep.). Moreover, the investigation disturbingly revealed Wanzek knew workers on the Azure Sky worksite were using the lifeline it installed, without adequate tensioning:

> Q.    How do you explain that, the complete lack of training and supervision by Nordex of its own employees that could possibly allow that to happen, sir?
>
> A.    My explanation was in regards of -- the common practice was identified during the investigation. The common practice was identified during the investigation that not only Nordex but everyone working on this -- on that area were utilizing the practice of climbing lifelines, whether it's temporary or fixed lifelines, without being properly tensioned.

App. 466 (Espinoza Second Dep.); App. 243 (Martinez Second Dep.); *see also* App. 34 (8D-Report).

**F.      Plaintiff relied on Wanzek for proper installation.**

Plaintiff was unaware of the dangerous condition. This was Plaintiff's first-time up Tower A-01. App. 179 (Martinez First Dep.). And when asked if he ever checked the tension at the bottom of the lifeline cable, Plaintiff said he doesn't remember but that he relies on those installing the cable and hopes "they did their job right." App. 202 (Martinez First Dep.). Mr. Martinez could not fully inspect the entire system himself before using it.

> Q.    Okay. Would you agree with me that if you are a competent person or a designated competent person for Nordex that you had the obligation to inspect the lifeline, the cable, before beginning work on the day of the incident?

> A.    That lifeline was already set when I got there. I have to trust the people that put it in that tower and set it up, and it was being used before my accident. Before I even got there, it was being used that day. I checked my Vi-Go on that lifeline and I had to trust the -- the man who installed it.

(Martinez First 93-94; *see also* 97).

**G.      Wanzek contractual obligations included provisions to keep Plaintiff safe.**

In its agreement with Enel, Wanzek committed to providing "Labor all of whom shall have experience with equipment necessary to perform the Work . . . who are competent to perform their assigned duties *in a safe and secure manner*." App. 352 (Wanzek Agreement) (emphasis added). It was also supposed to perform the work safely in accordance with prudent industry practice: "All such professional services shall be performed with the degree of care, safety, skill and responsibility customary among such licensed Personnel provided such performance is in accordance with Applicable Laws and Prudent Industry Practices." *Id.* Wanzek needed to "initiate and maintain safety precautions and programs . . . designed to prevent injury to all Persons (including members of the public and the employees, agents, contractors, consultants and representatives of Owner, Contractor and its Subcontractors, and other contractors and

subcontractors at or near the Work) . . . that are at or near the Project Site that are in any manner affected by the performance of the Work." App. 354 (Wanzek Agreement). Additionally,

> Contractor shall erect and maintain reasonable safeguards for the protection of Labor and the public. Contractor shall exercise reasonable efforts to eliminate or abate all reasonably foreseeable safety hazards created by or otherwise resulting from performance of the Work.

*Id.*

### H.    Wanzek admits its error—and everyone else agrees.

After the accident Wanzek safety coordinator, Toby Caro now admits that failure to install lifelines per manufacturer can lead to devastating consequences. App. 145 (Caro Dep). Mr. Caro similarly acknowledges that for individuals working at heights on massive towers, it is critical that fall protection equipment is properly selected, installed, inspected, maintained, tested, and used by competent persons to ensure it is in good working order and fit for its intended purpose before anyone climbs the tower. App 131 (Caro Dep. 47). And Wanzek admits adequate implementation of policies and procedures are critical for site safety. App. 131 (Caro Dep.).

Plaintiff's experts agree with Wanzek. Plaintiff's workplace safety expert Benjamin Gibson concluded that Wanzek's "failures and departures from industry standards and manufacturer's instructions combined to create and cause this incident:"

- Wanzek failed to erect and install the ladder equipment in accordance with the assembly instructions. The evidence shows that was not attached at the bottom of the ladder as was required by the manufacturer. This was also required by OSHA standards, as 1926.1053(a)(22) and (a)(23) specifies requirements for ladder safety devices and their related support systems. 1926.1053(a)(23) required that mountings for the carrier (the cable) be attached at each end of the carrier. Wanzek failed to adhere to the assembly instructions and applicable OSHA standards for fall protection.

- Wanzek chose not to connect and install the bottom bracket so that the permanent cable/ lifeline would be connected at the bottom of the ladder per the manufacturer's instructions. Instead of installing the cable as was required, Wanzek just zip tied the cable to the bottom of the ladder. Testimony from Wanzek Assistant Project Manager, Radi Jabour, confirmed that this was done just because Wanzek chose to do so.9

- Wanzek failed to tag the subject ladder climbing safety system as out of service and do not use. Such warning should have been present, as an administrative control measure to ensure that the system was not used until it was fully and correctly installed per the manufacturer's instructions. Had the proper ongoing inspections of the job site, materials, and equipment been performed, as required by OSHA 1926.20, this condition should have been correctly identified and corrected, or tagged out of service until corrected.

App. 19-20 (Gibson Report).

The McSwain engineers similarly found "Wanzek failed to follow the assembly instructions for the subject wind turbine tower and removed portions of the safety system prematurely. The installation of the subject Honeywell/Miller/Söll Vi-Go Vertical Cable Lifeline System was not complete and should have been tagged out." App. 678 (McSwain Report).

The other contractors on site likewise recognize Wanzek's failures. Enel's HSE director Gonzalo Espinoza similarly acknowledged that a warning sign should have been present:

Q.    And so, it's your understanding that the -- it's your understanding that the failure to put any type of sign indicating that this lifeline is not ready for use when it has not been completed does not meet what is required under this 2.3.3. Fair?

A.    Correct.

Q.    Is that a failure to follow these policies that we're talking about under these instructions that are provided by Nordex?

A.    Yes.

Q.    Does that fall below what you would expect of a general contractor and an owner of a site to do on the job site?

A.    Correct.

App. 284-285 (Espinoza First Dep.); see also 303. And Nordex's Construction Site Safety Officer David O'Brien testified that because the installation was incomplete and the lifeline cable was not certified for use, there should have been warning signs and/or the equipment should have been tagged out. App. 71 (O'Brien First Dep.). The investigation found there was no posted

warning that the lifeline cable system was not completed, which does not meet the required safety policies. App. 284-285 (Espinoza First Dep.). Using this equipment for construction thus fell below the standard of care:

> Q.    Right. And I understand that. And for the people of the ladies and gentlemen of the jury that might not understand what tag out is, can you explain what you mean by "tagged out"?
>
> A.    If there's a piece of equipment that is not 100 percent and ready to be used, it's standard practice to adhere a tag with the information that that particular piece of equipment is out of service and a date and typically a contact person for more information.
>
> Q.    Okay. And on the day of the incident when you got there, you didn't see any tag that tagged this lifeline out, did you?
>
> A.    No, sir.
>
> Q.    Okay. Does that fall below what you would expect as the safety person that works at wind turbines?
>
> A.    Yes, sir.

App. 71 (Obrien First Dep.).

On this record, Plaintiff raises genuine disputes of material fact, and Wanzek's motion for summary judgment should be denied.

## III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* FED. R. CIV. P. 56(c); *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "material fact" is one that might affect the outcome of the suit under governing law. *Id.*

Lastly, "[w]ith respect to a claim on which the movant bears the burden at trial, such as a defendant's request for summary judgment on an affirmative defense, the movant bears the burden of conclusively establishing every element of that claim or affirmative defense." *Cruz v. Centene Corp.*, 2:15-CV-380, 2016 WL 3906293, at *2 (S.D. Tex. July 19, 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A no-evidence summary judgment is not appropriate in such circumstances." *Id.*

## IV.    ARGUMENT

### A.    Plaintiff's claims are not limited to premises liability.

To begin, Wanzek improperly dismisses offhand Plaintiff's ordinary negligence claims. According to Wanzek, Plaintiff only alleges "*nonfeasance* theory of recovery" based in premises liability. (Doc. 79 at 11). Under Wanzek's preferred version of the law, any allegation that a party "failed" to do something must be restricted to a claim of premises liability.  To be sure, Plaintiff claims he was injured because of a defect on Plaintiff's premises, but the defect arose from Wanzek's active negligence and negligent undertaking as well. Under a theory of negligence and negligent undertaking, a defendant is regularly held liable for nonfeasance. *See, E.g., Helbing v. Hunt*, 402 S.W.3d 699 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). This duty is separate from premises liability. *See Elmgren v. Ineos USA, LLC*, 431 S.W.3d 657, 669 (Tex. App.—Houston [14th Dist.] 2014), *rev'd on other grounds*, 505 S.W.3d 555 (Tex. 2016) (negligent undertaking and premises liability involve two different theories of recovery). Even if they are

"similar" because liability can be based on a failure "to take protective action based upon special circumstances or the relationship between the parties." *Id.* at 838 (emphasis added).[6]

Wanzek cannot avoid liability by misinterpreting Plaintiff's pleadings. If Wanzek really thought the pleadings were deficient, they could have moved under Rule 12(b)(6) at any time in the last two years of litigating this case. And to the extent the Court deems Plaintiff's pleadings inadequate, discovery is ongoing, trial is months away, and the proper remedy is to allow Plaintiff to amend the pleadings to conform to the copious evidence of active negligence (and premises liability) here, so that this case can be decided on the merits.

### *1.    Wanzek owed a duty in ordinary negligence.*

One who performs an affirmative act must perform that act with reasonable care. "In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." Restatement (Second) of Torts § 302, cmt. a (1965).

Tort law "is grounded" on the principle that "every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission." *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). The Fourteenth Court of Appeals described this as "[t]he most basic common-law duty." *Nguyen v. Sephora USA*, No. 14-13-01017-CV, 2014 WL 4202538, at *2 (Tex. App.—Houston [14th Dist.] Aug. 26, 2014, no pet.). This has been Texas law for decades. *See, e.g.*, *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942) (one owes a duty

---

[6] Plaintiff has pled active negligence: Wanzek "had responsibility for fall protection during the Azure Sky Wind Project, and were responsible for implementing and enforcing adequate policies and procedures to ensure the safety of all workers working at heights, including Mr. Martinez." Doc. 1 (Original Petition). And Wanzek "failed to properly and adequately select, install, and/or maintain the fall-protection equipment for the project, including the Vi-Go." (*Id.*). Furthermore, Plaintiff alleged Wanzek failed to warn Plaintiff, provide adequate safety equipment, provide adequate fall protection equipment, properly and adequately install fall-protection equipment, properly and adequately maintain fall protection equipment, properly and adequately inspect fall protection equipment. (*Id.*).

of reasonable care if "his own act created the dangerous situation"). The Supreme Court refers to this bedrock duty as "the general duty to exercise reasonable care to avoid foreseeable injury to others." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987), *superseded by statute on other grounds, F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 684-85 (Tex. 2007).

The Supreme Court recently re-affirmed the basic duty that "a party who takes affirmative acts that create a danger . . . can be held responsible for the results of those actions . . . ." *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 639 (Tex. 2023). A defendant loaded oversized equipment ("boom lift") onto another entity's trailer for transport. *Id.* at 632-34. Part of that load "struck the overpass" and "collapsed onto the highway"—injuring a driver who was driving by. *Id.* The defendant who loaded the trailer argued it owed no duty because it was a mere bystander. *Id.* at 639. The Supreme Court disagreed because this injury was a foreseeable consequence of the failure to perform the "affirmative acts" associated with loading the trailer responsibly. *Id.* at 639 (internal citations omitted).

Here, Wanzek took multiple affirmative acts. It contractually committed to performing its work safely in accordance with industry standards to "prevent injury" to other contractors like Plaintiff. App. 352,354 (Wanzek Agreement). Beyond its contractual commitments, Wanzek actively chose the order of its turbine installation process, knowing that other contractors like Plaintiff would be using the permanent lifeline cable before it was fully secured and tensioned. App 566-567. (Jabour Dep.). And Wanzek intentionally used a temporary zip tie method to secure the cable out of the way, rather than completing the installation per the manufacturer's instructions prior to allowing access. App. 587, 589 (Carlson Dep.); App. 556, 571 (Jabour Dep.).

And Wanzek breached its duty proximately causing the Plaintiffs' injuries. Wanzek failed to follow the manufacturer's instructions and industry standards by not connecting and tensioning

the cable at the base of the tower before allowing it to be used. App. 34 (8D-Report); App. 557 (O'Brien First Dep.); App. 503 (Assembly Instructions). Instead, Wanzek zip-tied the loose cable out of the way, a dangerous and prohibited practice. *Id*.; App. 556, 558 (O'Brien First Dep App. 516 (Safety Alert). Wanzek compounded this improper installation by not tagging the lifeline as out of service or warning against its use until complete. App. 10-11 (Gibson Rep.); 276 (Espinoza First Dep.); App. 71 (O'Brien First Dep.).

These failures violated Wanzek's own safety policies, OSHA regulations, and the standard of care for the industry. App. 131 (Caro Dep.); App. 10-11 (Gibson Rep.); App. 518 (OSHA Report). Wanzek's own personnel admit that allowing use of an improperly installed lifeline was unacceptable and exposed workers to potentially devastating consequences. App. 136, 145 (Caro Dep.). Plaintiff's experts and the other contractors on site, along with OSHA investigators, all agree Wanzek's conduct fell below what was required. 10-11 (Gibson Rep.); 678 (McSwain); 71 (O'Brien Dep.); 277, 284-285, 303 (Espinoza First Dep.). This evidence raises fact issues as to Wanzek's negligence.

And lastly, Plaintiff's injuries were a direct and foreseeable result of Wanzek's negligence. The post-incident investigation determined the improperly installed lifeline failed to arrest Plaintiff's fall, causing him to plummet down the tower. 34-35 (8D-Report).

### 2.    *Wanzek owed a duty under negligent undertaking principles.*

Similarly, Wanzek owed a duty under negligent undertaking principles. As the Supreme Court of Texas explained in *Nall v. Plunkett*, the Restatement (Second) of Torts § 324A provides the elements of this claim:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

23

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).[7]

Again, Wanzek's undertaking is based on its contract as well as its affirmative conduct. *See supra* Part II.C. Moreover, Wanzek's failure to exercise reasonable care and proximate causation has already been discussed above. *Id.* Having undertaken these duties, Wanzek cannot now disclaim a duty to the Plaintiff. The evidence shows that all three pathways to a duty under § 324A are met here:

- **Subsection (a).** Wanzek's undertaking increased the risk of harm. By improperly installing the lifeline and allowing its use without adequate safety measures or warnings, Wanzek made the tower more dangerous than if it had not undertaken the task at all. 19-20 (Gibson Rep.); 516 (Safety Alert).

- **Subsection (b).** To the extent Enel still retained control over the tower, it would have owed a duty to Plaintiff as a premises owner/occupier. Enel contracted with Wanzek to fulfill this duty through the construction of the wind turbines, including the fall protection system. By assuming responsibility for erecting and maintaining the lifelines, Wanzek undertook Enel's duty to provide Plaintiff a safe means of accessing the tower. 65 (O'Brien Dep.); 7 (Gibson Rep.).

- **Subsection (c).** Plaintiffs relied on whoever installed the safety line. Plaintiff had to trust that the contractors erecting the turbine had done so correctly. 209 (Martinez Dep.). It was Plaintiff's first-time climbing Tower A-01, and he could not fully inspect the entire fall protection system himself before using it. 93-94, 184 (Martinez Dep.). The lifeline was the only fall protection available, and there were

---

[7] Similarly, under Texas law, "a person who agrees or contracts, either expressly or impliedly, to make safe a known, dangerous condition of real property may be held liable for the failure to remedy the condition." *Guereque v. Thompson*, 953 S.W.2d 458, 466–67 (Tex. App.—El Paso 1997, pet. denied); *New Hampshire Ins. Co. v. Rodriguez*, 569 S.W.3d 275, 287 (Tex. App.—El Paso 2019, pet. denied) ("One who agrees to make safe a known dangerous condition of real property owes a duty of due care.") (citing *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 54 (Tex. 1997)); *see also City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986). Under the same evidence, Plaintiff's owes a duty that arises from its express and implied obligations to make the work safe.

no warnings against using it. 587 (Carlson Dep.); 593 (Carlson Dep.). Wanzek asked him to use it when it asked him to check the guide pins.

As a result, Wanzek owed a duty to Plaintiff to use reasonable care under a negligent undertaking theory as well.

### 3.    *Wanzek owed a duty under a Redinger control.*

Wanzek also argues that it had no "control" over Plaintiff's work under a *Redinger*-type analysis. As shown above, Wanzek can be held liable under an ordinary negligence or negligent undertaking theory thus, a *Redinger*-type analysis of its retained control as the generally contractor is unnecessary. But regardless, there is evidence Wanzek exercised the type of control over the fall protection equipment to be held liable.

Control "may be shown with evidence that (1) a contract assigned control to the [general contractor] or (2) the [general contractor] 'actually exercised control' over the manner in which the work was performed." *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). "This control must extend to 'the means, methods, or details of the independent contractor's work . . . such that the [independent] contractor is not entirely free to do the work in his own way.'" *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 515 (Tex. 2022) (quoting *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020) (cleaned up)). "Further, the control 'must relate to the condition or activity that caused the injury.'" *Arredondo*, 612 S.W.3d at 295.

As relevant here, the Supreme Court "has recognized that a general contractor has actually exercised control of a premises when the general contractor knew of a dangerous condition before an injury occurred and approved acts that were dangerous and unsafe." *Bright*, 89 S.W.3d at 609 (citing *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001)). "Likewise, evidence showing a general contractor personally observed a safety hazard and nonetheless approved of

25

continuing the work raises a fact issue as to actual control." *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 868 (Tex. 2021) (citing *Lee Lewis*, 70 S.W.3d at 783-84).

In *Lee Lewis Construction* ("LLC"), the evidence demonstrated that LLC "personally witnessed and approved of the specific fall-protections systems KK Glass used" and "did not object" to the contractors' use of those systems, even though LLC knew they were deficient. 70 S.W.3d at 784. Based on this evidence, the Supreme Court held that "[a]lthough our law makes clear that a [property owner] is not an ensurer of safety on the jobsite . . . the testimony highlighted above constitutes more than a scintilla of evidence that LLC retained the right to control fall-protection systems on the jobsite." *Id.* Similarly, although the Court in *Bright* found a lack of actual control under the specific facts of that case, it noted "[h]ad the Dow safety representative actually . . . instructed Bright to perform his work knowing of the dangerous condition, we could have a fact scenario mirroring *Lee Lewis*." 89 S.W.3d at 609.

As shown repeatedly, the record here demonstrates that Wanzek both had contractual control and exercised control over the way the lifeline was installed and the safety precautions related to its use, which caused Plaintiff's injury. Wanzek was contractually responsible for erecting the wind turbines, including the fall protection systems, and doing so safely. Wanzek decided the order it would be construction and under what conditions it could be used. And Wanzek considered the lifeline "ready to be used" in its noncompliant condition and directed Plaintiff to climb the tower to inspect its work. Wanzek thus exercised "actual control" over the "condition or activity that caused the injury" as required to hold it liable. Thus, even under a retention-of-control theory, summary judgment should be denied.

**B.      In addition, Wanzek owed a duty in premises liability and Enel's breach proximately caused Plaintiff's injuries.**

*1.      Wanzek owed Plaintiff a duty of care as an invitee.*

Along with its liability for retained or exercised control above, Wanzek owed an independent duty as one of the contractors in charge of the premises. The scope of the duty owed in a premises defect case varies according to the claimant's status as invitee, licensee, or trespasser. *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex.2005). An invitee enters land with the owner's knowledge and for the mutual benefit of both. *Mayer v. Willowbrook Plaza Ltd. Partn.*, 278 S.W.3d 901, 909 (Tex. App.--Hous. [14th Dist.] 2009). A licensee enters and remains on land with the owner's consent and for the licensee's own convenience, or on business with someone other than the owner. *Id.* And a trespasser enters another's property without lawful authority, permission, or invitation. *Id.*

Whether a party was an invitee, licensee, or trespasser is a legal question that turns on "the facts surrounding the occurrence in question." *Am. Industries Life Ins. Co. v. Ruvalcaba*, 64 S.W.3d 126, 134 (Tex. App.--Hous. [14th Dist.] 2001) (citing *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex.1999); *Oncor Elec. Delivery Co., LLC v. Murillo*, 449 S.W.3d 583, 595 (Tex. App.--Hous. [1st Dist.] 2014) ("premises-liability theory required the determination of predicate facts to establish the appropriate legal duty."). Indeed, "[t]he determination of whether a person is a licensee or an invitee is dependent upon the facts and circumstances surrounding a particular case, and such facts and circumstances, sometimes involve matters of custom, whether it is to the mutual advantage of both the occupier of the premises and the person entering thereon for such person to be on the premises, whether the conduct of defendant and his employees was such as to amount to an implied invitation, and other matters." *Arambula v. J. M. Dellinger, Inc.*, 415 S.W.2d 456, 458–59 (Tex. Civ. App.--San Antonio 1967), *writ refused NRE* (Oct. 4, 1967).

27

Here, Plaintiff was an invitee because he was in the turbine Wanzek's knowledge and for the mutual benefit of both. 7 (Gibson Report). In fact, Plaintiff was onsite specifically to help Wanzek figure out a problem it was having with installing the nacelle. Wanzek was aware of Plaintiff's presence and purpose—it asked Plaintiff to be there to climb Tower A-01 to inspect and document problems. 180, 183 (Martinez Dep.). Thus, there is substantial evidence Plaintiff entered the tower with Wanzek knowledge and consent, and that he was performing a task that mutually benefitted both companies in furtherance of the wind farm construction.

Wanzek argues Plaintiff was a trespasser and therefore owed only a minimal duty, but the only possible way to this conclusion is to view the evidence in the light most favorable to Wanzek, ignoring the substantial contrary evidence revealing Plaintiff's invitee status. Wanzek cherry-picks selected facts suggesting Plaintiff was on the premises unauthorized while disregarding the ample direct and circumstantial evidence that Plaintiff was explicitly requested to climb Tower A-01 by Wanzek. *See*, e.g., supra Part II.D. Wanzek cannot obtain summary judgment by blindly asserting Plaintiff was trespassing in the face of this contrary proof. At minimum, there is a genuine fact issue as to Plaintiff's status that precludes judgment as a matter of law on this issue alone.

### 2. *Factual disputes preclude summary judgment on each element of Plaintiff's premises liability claim.*

An owner or occupier of land must use reasonable care to protect an invitee from known conditions that create an unreasonable risk of harm and conditions that should be discovered by the exercise of reasonable care. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex.2000); Ruvalcaba, 64 S.W.3d at 134. To prevail on a premises liability claim, a plaintiff must prove four elements: (1) the owner had "actual or constructive knowledge of some condition on the premises"; (2) "the condition posed an unreasonable risk of harm"; (3) the owner "did not exercise reasonable care to reduce or eliminate the risk"; and (4) the owner's "failure to use such care proximately

caused the plaintiff's injury." *Armendariz v. Wal-Mart Stores, Inc.*, 721 Fed. Appx. 368, 370 (5th Cir. 2018) (unpublished) (citing *CMH Homes, Inc.*, 15 S.W.3d at 99)

### a.    Knowledge

Plaintiff may prove that the defendant had actual or constructive knowledge of a premises defect to meet the first element. *Farrar v. Sabine Mgt. Corp.*, 362 S.W.3d 694, 700 (Tex. App.— Hous. [1st Dist.] 2011) ("A plaintiff may prove notice by establishing that the defendant actually knew that the condition was dangerous or that it is more likely than not that the condition existed long enough to give the owner-operator a reasonable opportunity to discover it."). Knowledge may be established by circumstantial evidence of knowledge. *Keetch v. Kroger Co.*, 845 S.W.2d 262, 266 (Tex. 1992).[8]

There is no serious dispute that the safety line on Tower A-01 was zip tied to the bottom of the ladder rather than properly secured and tightened per manufacturer's instruction. *See supra* Part II.B. And the evidence shows that Wanzek had actual or constructive knowledge about this condition beforehand—indeed it admits as much. *See supra,* Part II.C and D. Whether Enel knew or should have known of the dangerous conditions here is a factual dispute for the jury.

### b.    Unreasonable risk of harm

The dangerously improper tensioning of the cable lifelines no doubt constituted an unreasonable danger to workers climbing the towers. The post-accident Safety Alert issued by Nordex emphasizes the "serious risk of falling" posed by using incomplete or un-tensioned

---

[8] A party's knowledge generally is a question of fact reserved for the jury. *E.g., Wohlstein v. Aliezer*, 321 S.W.3d 765, 777 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (collecting cases). That is because a party's subjective state of mind is "uniquely a fact question for the trier of fact after considering all the relevant evidence." *Kielwein v. Gulf Nuclear, Inc.*, 783 S.W.2d 746, 748 (Tex. App.—Houston [14th Dist.] 1990, no pet.). And because "[i]ssues of intent and knowledge are not susceptible of being readily controverted[.]" *Frias v. Atlantic Ritchfield Co.*, 999 S.W.2d 97, 106 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

lifelines. App. 516 (Safety Alert); *see also* App. 14-15 (Gibson Report). Indeed, the precise risk warned against came to fruition—the cable grab mechanism failed to safely arrest Plaintiff's fall due to the slack in the inadequately tensioned line. App. 35, 39 (8D-Report).

   **c.**  **Reasonable care and causation**

   As explained throughout this brief, there is much evidence Wanzek failed to exercise reasonable care by neither warning Plaintiff nor making the condition reasonably safe. *See supra*, Part II.H. And those failures proximately caused Plaintiffs' injuries because has Wanzek warned Plaintiff or completed the lifeline before allowing him to climb, Plaintiff would not have been injured. *Id*.

   ***3. The defect was not obvious.***

   Wanzek cannot shed its duty by claiming the zip-tied rope was an open and obvious danger. Texas Courts have applied the open and obvious doctrine only to premises liability. Under the doctrine, when the danger is open and obvious enough, a property owner may have no "obligation to warn of the danger or make the premises safe, as a matter of law." *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 788 (Tex. 2021), reh'g denied (June 11, 2021). But under an objective standard, the Court "must consider the 'totality of' the 'particular' circumstances the plaintiff faced." *Id.*

   Wanzek relies on *Los Compadres*, but that case supports denying summary judgment here. The Court there found that while "the presence of the power line was open and obvious" and "there is an inherent danger in working around live wires" the Court could not say that "the fact that the power line was energized and thus dangerous was open and obvious as a matter of law." Los Compadres, 622 S.W.3d at 789. Similar unknowns as to the scope of the danger have precluded summary judgments in other cases. *See Harris Cty. v. Eaton*, 561 S.W.2d 245, 246 (Tex.Civ.App.—

30

Houston [14th Dist.] 1978), aff'd, 573 S.W.2d 177 (Tex. 1978) (pothole visible from a distance not an open and obvious danger because its depth could not be determined from a distance); *Hous. Sports Ass'n v. Russell*, 450 S.W.2d 741, 746 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.), (unusually deep step along a walking path was not an open and obvious danger, given its depth could not be readily ascertained when walking downward and the step was in an area frequented by tour groups whose members might be distracted). And the obviousness of the danger is often a question of fact precluding summary disposition. *Prado v. Lonestar Res., Inc*., 647 S.W.3d 731, 746 (Tex. App.—San Antonio 2021, pet. filed) (in railroad crossing accident owner had actual knowledge of dangerous condition but question of fact preclude summary judgment about licensees knowledge when it was his "first day of work" and there was evidence his view was obstructed); *see also Rodriguez v. Cemex, Inc.*, 579 S.W.3d 152, 169 (Tex. App.—El Paso 2019, no pet.).

There is plenty of evidence that the dangerous condition of the lifeline was not open and obvious here. Plaintiff testified that he had to rely on and trust those who installed the lifeline—Wanzek—that it was safe for use. Wanzek, the party responsible for installing the lifeline, apparently didn't think the danger was open and obvious because its own employees considered it "ready to be used" in its defective condition. If the improper installation was not open and obvious even to the contractor who performed the installation, it cannot be considered open and obvious as a matter of law. And Wanzek knew of the frequent utilization of its improperly installed equipment by all the contractors on site, not just Plaintiff, demonstrating a lack of awareness of the hazard, and that a reasonable person would not know of the danger. At minimum, this evidence raises a fact issue as to whether the hazardous condition of the lifeline was open and obvious.

> **4.    Even if Plaintiff were a trespasser (he wasn't) factual disputes preclude summary judgment disposition.**

Even considering Plaintiff a trespasser, the duty a premises owner or occupier owes to a trespasser is not to cause injury willfully, wantonly, or through gross negligence. *Texas Utilities Elec. Co. v. Timmons*, 947 S.W.2d 191, 193 (Tex.1997). And there is substantial evidence Wanzek was grossly negligent here.

Gross negligence inquiry involves two components: one objective and one subjective.

- First, "viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others." *Lee Lewis*, 70 S.W.3d at 785.

- Second, "the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others." *Id.*; *see U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012).

Circumstantial evidence satisfies either prong. *Lee Lewis*, 70 S.W.3d at 785. And a finding of gross negligence usually depends on inferences, circumstantial evidence, and credibility determinations implicating questions of fact. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (a plaintiff may prove either element by circumstantial evidence).

> **a.    Wanzek's conduct created an objectively high degree of extreme risk.**

The objective prong requires an "[e]xtreme risk," meaning a "likelihood of serious injury to the plaintiff," as determined "from the perspective of the actor, not in hindsight." *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008).

A plaintiff can prove this element by showing that the danger "was common knowledge in the [relevant] industry." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 922 (Tex. 1998). In *Ellender*, the plaintiff satisfied the objective element with reports from industry groups that benzene exposure could "cause leukemia," as well as oil companies' warnings that such exposure "may be very dangerous." *Id.* at 922–23. In light of this risk, Mobil's policy of exposing some

workers to benzene "and not providing them with protective gear" created an objectively "extreme degree of risk." *Id.*

Similarly, in *Lee Lewis*, the Supreme Court considered whether the defendant's decision to allow window-washers to "work[] on the tower's ninth and tenth floors without using an independent lifeline created an extreme risk of a fatal fall." 70 S.W.3d at 785. Finding that it did, the Supreme Court first noted trial testimony from the defendant that "falls are among the top reasons for serious injuries or deaths on construction projects, and that the hospital project presented a fall hazard." *Id.* This was confirmed by the testimony of other employees that "the project posed obvious risks of falls." *Id.* at 786. Based on this evidence, the Supreme Court held that "in this case, there is evidence that does satisfy the objective component, and that is the extreme risk of serious injury, apparent to anyone in LLC's position, from not using an independent lifeline while doing exterior work on the tenth floor of the building." *Id.*

Just like in *Ellender* and *Lee Lewis*, the evidence here demonstrates that Wanzek's conduct created an objectively extreme degree of risk. It is common knowledge in the wind turbine construction industry that falls from high height are one of the most serious hazards facing workers. 131 (Caro Dep.). Wanzek's own safety coordinator acknowledged that for individuals working hundreds of feet in the air, it is critical that fall protection equipment be properly installed and certified before use, as failure to do so can lead to devastating consequences. 129, 145 (Caro Dep.).

Yet despite this known danger, Wanzek allowed/instructed workers to access Tower A-01 using a lifeline system that was not installed in accordance with the manufacturer's instructions. Industry standards, OSHA regulations, and Wanzek's own policies all recognize the extreme risk posed by an improperly installed lifeline. App. 10-11 (Gibson Rep.); 137 (Caro Dep.); App. 518 (OSHA Report). From an objective standpoint, Wanzek's decision to allow the use of a

noncompliant fall protection system for work at extreme heights posed a likelihood of serious injury to anyone in Plaintiff's position. This evidence raises a fact issue as to the objective prong of gross negligence.

        **b.**      **Wanzek had subjective awareness of the risk involved.**

Moreover, Wanzek had the subject awareness of the extreme risk involved. Under the second element, actual awareness means that the defendant knew about the peril, but its acts or omissions showed that it did not care. *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex. 1998). "The subjective element of "[g]ross negligence does not require proof the defendant intended or tried to harm the plaintiff; it requires proof the defendant was subjectively aware of the risk involved and chose to proceed in conscious indifference to the rights, welfare, and safety of others." *Turner v. Franklin*, 325 S.W.3d 771, 784 (Tex. App.—Dallas 2010, pet. denied). Importantly, "[e]vidence of 'some care' will not disprove gross negligence as a matter of law." *Id.* (citing *Ellender*, 968 S.W.2d at 923-24).

And Texas courts recognize that a defendant's "intent, belief, or lack thereof is uniquely a fact question for the trier of fact *after* considering all of the relevant evidence." *Kielwein v. Gulf Nuclear, Inc.*, 783 S.W.2d 746, 748 (Tex. App.—Houston [14th Dist.] 1990, no writ) (internal citation omitted)(emphasis added); *see also Turner v. Franklin*, 325 at 782–83 ("Because willful and wanton negligence (i.e., gross negligence) has a subjective element inquiring into the defendant's state of mind, and because *issues of intent are usually best left to the trier of fact* to resolve based on all the evidence and surrounding circumstances, determining that issue by summary judgment usually will be inappropriate.") (emphasis added); *Lawrence v. TD Indus.*, 730 S.W.2d 843, 845 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ("Gross negligence is proved either by showing actual subjective intent or by proving that under the surrounding circumstances

a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others . . . An issue such as reasonableness, however, is inherently an issue for a jury . . . Because of variations of the circumstances which may be shown at a trial on the merits, *summary judgment is rarely justified in such cases*.") (internal citations and quotation omitted) (emphasis added); *THI of Texas at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 580 (Tex. App.—Amarillo 2010, pet. denied) ("It is this mental attitude of reckless indifference that permits a jury to find that the defendant had decided to ignore the rights of others even in light of probable and threatened injury to them.") (internal quotations omitted).

The evidence here likewise demonstrates Wanzek's subjective awareness of the risk posed by its negligent installation of the lifeline. Wanzek was responsible for erecting the fall protection system on the wind turbine towers. App. 553, 566 (Jabour Dep.); App. 129-130 (Caro Dep.). Wanzek made the decision to allow use of the lifeline before it was properly secured at the base, knowing other contractors like Plaintiff would be accessing the tower in this condition. App. 556-557, 564, 566-567 (Jabour Dep.).

Wanzek had received the manufacturer's instructions specifying that the lifeline must be connected and tensioned at the bottom before use. 493 (Assembly Instructions). It was also aware of the industry standards and its own safety policies requiring the same. 148, 149 (Caro Dep.). The post-incident "Safety Alert" and Wanzek personnel's testimony further confirm the company understood the serious risk of falling posed by a lifeline that was not 100% installed per the manufacturer's directions. 516 (Safety Alert); App. 131, 145 (Caro Dep.).

Despite this subjective knowledge, Wanzek took no action to prevent access to or provide warnings about the dangers of the prematurely installed lifeline. App. 611, 616 (Carlson Dep.); App. 556, 561 (Jabour Dep.). In fact, Wanzek considered the lifeline "ready to be used" in its

noncompliant condition. App. 587 (Carlson Dep.). Wanzek knew the frequent utilization of its improperly installed equipment was by contractors on the jobsite without intervention. 41 (8D-Report); App. 279 (Espinoza First Dep.); 243 249 (Martinez Dep.).

As a result, Wanzek's motion should be denied.[9]

## V.    RULE 56(F) MOTION TO CONTINUE

The Court should deny Wanzek's motion on the current record alone. But as Plaintiff explained in his response to Enel's motion for summary judgment (Doc. 82), if the Court disagrees, Plaintiff requests that this Court defer consideration until after the completion of two already scheduled depositions—Nordex managers Blake Carlson and Jake Rawlins. Good cause exists to wait until the record is complete as shown below.

Rule 56(d) was designed to "safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Fruge v. Ulterra Drilling Techs.*, L.P., 883 F. Supp. 2d 692, 699 (W.D. La. 2012). To that end, Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

In the Fifth Circuit, Rule 56(d) motions are broadly favored, and the Court should liberally grant them. *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1267 (5th Cir.1991). The Rule is often invoked when a party claims that it has had insufficient time for discovery. To obtain a continuance, the nonmovant need only show: (1) a description of the particular discovery it intends to seek; (2) an explanation showing how that discovery would preclude the entry of summary

---

[9] On this same record, and under the same arguments, the Court should deny Wanzek's motion for summary judgment on Plaintiff's claim for gross negligence as well.

judgment; and (3) a statement justifying why this discovery had not been or could not have been obtained earlier. *Fruge v. Ulterra Drilling Techs., L.P.*, 883 F. Supp. 2d 692, 699 (W.D. La. 2012).

Two critical depositions remain outstanding in this case—Blake Carlson and Jake Rawlins. Both were members of Nordex's site management team the time of this accident, were on site and responded to the accident, and were part of the investigation team after the accident. *See, e.g.,* (Doc 69 at 18); App. 50 (O'Brien First Dep.).

Plaintiff seeks these depositions as critical witnesses regarding events leading up to the accident and those post-accident. As Plaintiff's supervisors, Plaintiff believes they received instructions from Wanzek and told Plaintiff to climb the tower to perform an inspection. They both likely have information about Wanzek's responsibilities and duties on the site, Wanzek's knowledge of dangerous conditions, and Plaintiff's status as an invitee.

The parties have been diligent in discovery deposing more than a dozen witnesses to date. Mr. Carlson's deposition is scheduled for March 14, 2024, and Mr. Rawlins is scheduled for April 26. Plaintiff does not seek this discovery for delay, but in the interest of justice. Because any motion under Rule 56(d) should be liberally granted, and because Plaintiff diligently seeks discovery targeted at uncovering facts to support Plaintiff's already cognizable claim for negligence against Wanzek, if the Court is not already inclined to deny Wanzek's motion, it should defer consideration until after these depositions. App. 787 (Courtney Decl.).

## VI.    CONCLUSION

For these reasons, the Court should deny Wanzek's Motion, or defer consideration until discovery, and the record, are complete.

Respectfully submitted,

**ARNOLD & ITKIN, LLP**

*/s/ Trevor M. Courtney*
Noah M. Wexler
State Bar No. 24060816
Trevor M. Courtney
State Bar No. 24125599
6009 Memorial Drive
Houston, Texas 77007
Telephone: (713) 222-3800
Facsimile: (713) 222-3850
e-service@arnolditkin.com
nwexler@arnolditkin.com
tcourtney@arnolditkin.com

***Plaintiff's Attorneys***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record here in accordance with the Federal Rules of Civil Procedure on March 7, 2024.

*/s/ Trevor Courtney*
Trevor Courtney